**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>MEDICAL TECHNOLOGY ASSOCIATES II, INC.,<br><br>Debtor.[1] | Chapter 11<br><br>Case No.: 22-10534 (CTG) |

**DECLARATION OF HUBERT HO IN SUPPORT OF**
**DEBTOR'S PETITION AND FIRST DAY MOTIONS**

I, Hubert Ho, hereby declare under penalty of perjury:

1. I am Chief Operating Officer and Chief Financial Officer of Medical Technology Associates II dba 8BioMed (collectively, the "Debtor" or "MTA2").

2. I have been serving the Debtor in various capacities since June 2019.

3. I submit this declaration ("Declaration") in support of the Debtor's chapter 11 bankruptcy petition and in support of the Debtor's "first day" motions and applications, described in further detail below (collectively, the "First Day Motions"). I am over 18 years of age and am competent to make this Declaration and testify to the facts set forth herein.

4. I, or those employees of the Debtor under my supervision, am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with current and former officers and other members of the Debtor's management team, senior personnel, and advisors, my review of relevant documents and information concerning the Debtor's operations and financial affairs as well as the Debtor's books

---

[1] The last four digits of the Debtor's U.S. tax identification number are (3760). The Debtor's mailing address is 1176 Tourmaline Dr, Thousand Oaks, CA 91320.

and records, or my opinions based upon my experience and knowledge. If called as a witness to testify in this matter, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

5. On the date hereof (the "Petition Date"), the Debtor filed its voluntary petition (the "Petitions") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") commencing the above-captioned bankruptcy case (the "Cases"). It is anticipated that the Debtor will continue to manage its affairs and operate its business as a debtor and debtor-in-possession pursuant and subject to the requirements of sections 1107(a) and 1108 of the Bankruptcy Code.

6. I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe the relief sought in each First Day Motion will allow for an orderly transition of the Debtor into this Case and permit the Debtor to achieve its bankruptcy objectives as further described below.

7. Part I of this Declaration describes the Debtor's business, capital structure, and the events leading to the filing of the Petition. Part II of this Declaration sets forth the First Day Motions[2] and the relevant facts in support of those motions.

**Background**

A. **History of the Debtor and the Nature of the Debtor's Business Operations**

8. MTA2 is a biopharmaceutical company focused on the research and development ("R&D") and future manufacturing and commercialization of hemoglobin based oxygen carriers ("HBOC") for various indications and applications related to the use of blood, including trauma

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

2

and organ preservations. MTA2 was established in 2015 as as Delaware company, finished its Series A and B rounds of funding between 2017 and 2019, fitted-out its R&D and manufacturing facility in Malvern, Pennsylvania between 2018 and 2019, and relocated its principle office to California between 2020 and 2022. It is also doing business as "8BioMed". Additional details regarding the Debtor's business, assets, capital structure, and the circumstances leading to the filing of this case are set forth in the Ho Declaration.

### B.     Organizational Structure, Governance, and Current Management

9.      MTA2 is a corporation organized and existing under the laws of Delaware with a principal place of business and its home office at 1176 Tourmaline Dr, Thousand Oaks, CA 91320.

10.     By board consent dated June 30, 2017, Carl Rausch, as sole director, appointed himself as President, Treasurer and Secretary. At the same time Mr. Rausch appointed Cheng Conroy as Treasurer.

11.     By board consent dated September 17, 2017, MTA2's board of directors authorized the issuance of shares of common stock to New World Technology II, LLC ("NWT II"), an entity controlled by Mr. Rausch, and to Conroy personally. The board consent also authorized the issuance of Series A Preferred Stock and expanded the size of MTA2's board of directors to three members: Carl Rausch, Cheng Conroy and Xiaowei Hu.

12.     MTA2's authorized capitalization consists of 75,000,000 shares of common stock and 25,000,000 shares of preferred stock. Fifteen million shares of preferred stock are designated as Series A Preferred Stock ("Series A Stock") and 9,556,873 shares of preferred stock are designated as Series B Preferred Stock ("Series B Stock"). The preferred shares are currently convertible into common stock on a 1:1 basis. All authorized classes of stock are voting stock and carry one vote.

13. There are outstanding 45 million shares of Common Stock, 15 million shares of Series A Stock and 5,934,066 shares of Series B Stock, for a total of 65,934,066 voting shares. MTA2's outstanding shares is held as follows:

| Holds or controls | Shares by class/series | Total Shares | %* |
|---|---|---|---|
| Carl Rausch | 30,000,000 Common Stock via New World Technology II, LLC | 30,000,000 | 45.50 |
| Conroy Chi-Heng Cheng | 15,000,000 Common Stock individually and 2,967,033 Series B Stock through Gold Blaze Ltd. | 17,967,033 | 27.25 |
| Legends Forever Investment Ltd. | 15,000,000 Series A Stock 2,967,033 Series B. Stock | 17,967,033 | 27.25 |

*Fully diluted and on an as converted basis

14. On November 7, 2018, in connection with authorizing the Series B Preferred Stock issuance, the three member MTA2 board of directors was further expanded to four members and Haoyuann Chen was designated as the fourth director. Carl Rausch resigned as a director in December 2019 and has not yet been replaced. As a result, there is one vacancy on the board of directors which Carl Rausch is authorized to fill. Therefore, MTA2 currently has three board members.

    C.    **Capital Structure**

15. As of April 30, 2022, MTA2 had current assets of $1.8 million on a book value basis, fixed assets net of depreciation of $10.6 million on a book value basis, and receivables and investments in the amount of $1.8 million and $1 million, respectively.

16. As of April 30, 2022, MTA2 had outstanding trade debt of approximately $371,635.88, accrued interest of $988,000.01 on the Gold Blaze Limited Note Payable (as defined below), and other miscellaneous current liabilities of approximately $127,910.80.

17. As of April 30, 2022, MTA2 owed $10 million on an unsecured note payable to Gold Blaze Limited pursuant to an unsecured note dated March 4, 2021 (the "Gold Blaze Limited

Note Payable"). In addition, Gold Blaze Limited overfunded the Gold Blaze Limited Note Payable in the amount of $500,000.

18. For the period ending April 2022, MTA2 had net income of ($407,671.89). As a development stage research company, MTA2 had no operating income versus operating expenses of $326,107.22 and other expenses of $84,903.20.

**D.     Circumstances Leading to Chapter 11 Filing**

19. The Debtor is experiencing a liquidity crisis and requires new investment in order to fund its operations. As of June 12, 2022, the Debtor only had $116,231.23 cash available. At its current burn rate, the Debtor's funding will last less than two weeks. Without further capital injection, it will not be able to continue operations.

20. Through this proceeding, the Debtor intends to cancel existing equity and facilitate a new equity infusion to provide the Debtor with sufficient operating capital to continue its research and development and bring its technology to market eventually.

21. To accomplish this goal, the Debtor hopes to stay the current litigation that has been plaguing the Debtor. The Debtor has spent in excess of $3 million in legal fees relating to litigation and is unable to attract new investment with this level of litigation expense and uncertainty.

22. In addition, the Debtor currently leases property in Malvern Pennsylvania. The leased property is located at 275 Great Valley Parkway, Malvern Pennsylvania and consists of approximately 12,000 square feet. The Debtor's current annual rent for the Malvern facility is $157,644 plus common area maintenance expenses. The Debtor has relocated its operations to Thousand Oaks California and no longer uses the Malvern property and intends to market the lease to identify a potential assignee for the Malvern lease which includes a build out of existing $10 million value on the Debtor's books.

**First Day Motions**

23. The Debtor filed the First Day Motions contemporaneously herewith to ensure that the Debtor's business continues to function during the Case. For the reasons set forth below, the relief requested in the First Day Motions is necessary to (i) stabilize the Debtor's business operations, (ii) operate with minimal disruption during the pendency of the Case, (iii) maintain the Debtor's value as a going concern, and (iv) facilitate the efficient and economical administration of the Case. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.[3]

**A. DIP Motion**

24. Pursuant to the DIP Motion, the Debtor requests (a) entry of interim and final orders authorizing the Debtor to enter into a senior secured super-priority credit facility in the aggregate amount not to exceed $1,525,000 substantially on the terms set forth in the Debtor In Possession Credit And Security Agreement between the Debtor and Gold Blaze, Ltd., (b) modifying the automatic stay to the extent applicable and (c) granting related relief.

25. The Debtor proposes to enter into the DIP Financing in order to fund the administration of this Case and its reorganization, solely in accordance with the DIP Budget. The DIP Financing will provide the Debtor with up to $1,525,000 to fund necessary operations of the Debtor and to administer this Case through a successful sale or reorganization of the Debtor's assets and liabilities. Without such funding, the Debtor would have to cease operations and lose substantial value to the detriment of all creditors.

---

[3] Capitalized terms used but not otherwise defined in this Section shall have the meanings ascribed to them in the applicable First Day Motion.

26. I believe that the relief requested in the DIP Motion is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and will enable the Debtor to continue to manage its business operations during the pendency of this Case without disruption. Accordingly, I respectfully submit that the DIP Motion should be approved.

**B. Cash Management Motion**

27. In the ordinary course of its business, the Debtor maintains a cash management system (the "Cash Management System"), which includes all activities necessary and pertinent to collecting and disbursing the Debtor's cash assets. The Cash Management System allows the Debtor to efficiently identify its cash requirements and transfer cash as needed to respond to these requirements. The Cash Management System is important to the efficient execution and achievement of the Debtor's business objectives, and, ultimately, to maximizing the value of the Debtor's estate.

28. The Debtor maintains four (4) separate bank accounts (collectively, the "Accounts"): (i) Account No. XXXXXXXX6909 and Account No. XXXXXXXX3389 with Chase; and (ii) Account No: XXXXXXX8457 and Account No: XXXXXXXX8063 with BofA.

29. The Chase account ending in 3389 is a checking account for writing checks and wire transactions directly to outside accounts. Chase account ending in 6909 is a holding account, that receives investor funds and transfers amounts monthly to operating account to pay bills. BofA account ending in 8063 is an operating account that pays almost all of the Debtor's bills. BofA account ending in 8457 is an account that held tenant iCura's deposit for sublease space.

30. The Debtor follows specific internal cash management procedures (the "Procedures") associated with its disbursements. On a monthly basis, funds are transferred from the Debtor's Chase 6909 holding account to the Debtor's BofA 8063 operating account for an

amount approximately equal to the Debtor's monthly expenses due each month. All of the Debtor's expenses, except for employees' expense reimbursements, are paid through its BofA 8063 operating account including the Debtor's debit card purchases if necessary. Authorization and approval of such expenses are by Procurement Express that handles purchase orders and invoices, and by bill.com for payments. Procurement Express is managed by the Debtor's accounts payable department, and bill.com payments are managed by Smartbooks.

31. For amounts needed for checks or wire transfers, money is transferred from the Debtor's holding account Chase 6090 holding account to its Chase 3389 checking account. The transfer of money between the Debtor's holding and checking account, and check writing and wiring from the Debtor's Chase 3389 checking account, is managed by the Debtor's Chief Financial Officer.

32. The Debtor's account payable department has visibility to all bank accounts. Smartbooks can process payments via the Debtor's BofA 8063 operating account. The Debtor's Board of Directors receives monthly accounting report and monthly account statement from all accounts on a regular basis. Smartbooks enters bills from the bill.com inbox on Tuesday and Thursday of every week (if urgent, Smartbooks can enter a bill upon receiving an email request). Once entered, Smartbooks will assign all bills <$2,500 to the accounts payable department for approval and all bills >$2,500 to both the Chief Financial Officer and accounts payable department for approval. Smartbooks will pay all approved bills on Tuesday and Thursday of every week (if urgent, Smartbooks can pay a bill upon receiving an email request).

33. In the ordinary course of business, BofA and Chase debit the Accounts for fees and expenses related to wire transfers and other fees, costs, and expenses that are standard for a typical

corporate bank account (collectively, the "Bank Fees"). The Bank Fees are either debited directly from the Debtor's bank account or paid in connection with wire transfers.

34. The Cash Management System constitutes an ordinary course and essential business practice and provides significant benefits to the Debtor and its estate, including, *inter alia*, the ability to: (a) control and secure corporate funds, (b) ensure the maximum availability of funds, when necessary, (c) reduce costs and administrative expenses associated with the movement of funds, and (d) obtain timely and accurate account balance information.

35. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and will enable the Debtor to continue to manage its business operations in chapter 11 without disruption. Accordingly, I respectfully submit that the Cash Management Motion should be approved.

**C. Employee Wage Motion**

36. The Debtor employs a total of 3 people as of the Petition Date. The Debtors' current and former employees are collectively referred to herein as "Employees" or, in the singular, "Employee." The independent contractors are collectively referred to herein as "Independent Contractors."

37. The Employees perform a variety of functions for the Debtor, including, without limitation, research and development, overall management of the Debtor's operations and financial affairs.

38. To minimize the personal hardship that the Employees and Independent Contractors will suffer and the immediate, and irreparable harms to the Debtor's business that will result if the Employee Obligations are not paid when due or as expected, as well as to maintain morale and assure continuity in the Debtor's workforce and operations, the Debtor seeks authority

to continue to pay the Employee Obligations, regardless of whether such Employee Obligations arose prepetition or post-petition, as set forth herein to, or on behalf of, Employees, including all costs and expenses incident thereto.

39. The Debtor also requests that the Court authorize applicable banks and other financial institutions to receive, process, honor, and pay all pre-petition checks and transfers drawn on Debtor's accounts to satisfy the Employee Obligations.

**A. Salaries, Wages, Paid Time Off, Payroll Taxes and other Withholdings**

40. <u>Salary</u>. The Debtor's payroll is bi-weekly and is paid on Thursday for the two week period covering through the prior Friday. As of the Petition Date, the Debtor will owe accrued payroll of approximately $13,113 for accrued payroll obligations from June 4, 2022 through June 13, 2022. The Debtor's next payroll will be paid on June 23, 2022, covering the pay period dating from June 5, 2022 through June 18, 2022. The total amount of payroll for that week will be approximately $21,855.03.

41. <u>Benefits</u>. The Debtor provides various benefits to its employees including health insurance, dental insurance, vision insurance, life insurance and short-term and long-term disability. The Debtor's total expense for employee benefits is approximately $4,692.51 per month. The Debtor also provides a 401k plan to its employees that is administered by ADP and managed by Voya Financial. The Debtor's 401k plan is a matching plan up to 4% of an employees' salary.

42. Further, Debtor requests that any payroll service provider, including, without limitation, ADP, be authorized to continue any pre-petition payroll funding process as such process existed prior to the Petition Date, including initiation of ACH or other electronic transfer withdrawals from the Debtor's bank accounts. The Debtor also requests authority to pay its payroll

services provider, ADP, any and all processing fees related to the payroll services provided by ADP even if those services and charges were incurred prepetition.

43. <u>Paid Vacation/Personal Time</u>. The Debtor also offers a variety of paid time off and personal time, including Bereavement Leave; Family and Medical Leave under the Family and Medical Leave Act of 1993; Jury Duty Leave; Military Leave; Personal Days; and Vacation. The Debtor also recognizes the following holidays: New Year's Day; Good Friday; Memorial Day; Independent Day; Labor Day; Thanksgiving Day; Day before/after Thanksgiving (to be determined annually); Christmas; and the day before/after Christmas (to be determined annually). Employees are also eligible for Vacation/paid time off depending on their length of service with the Debtor.

44. <u>Employee Withholdings</u>. The Debtor deducts certain amounts from Employees' paychecks and are obligated to remit such withholdings on behalf of the Employees, including: (a) federal, state and local income taxes and the individual Employee's portion of FICA; (b) deductions for health insurance plan premiums for which the Employees are responsible; and (c) deductions for court-ordered child support, garnishment, and bankruptcy-related obligations. Debtor seeks authority to remit the sums withheld pre-petition that the Debtor is obligated to remit to such third-party payees but have not yet remitted to the appropriate payees.

**B. Reimbursement of Employee Costs and Expenses**

45. The Debtor owes certain of its Employees for reimbursement of office supplies and business-related expenses, including travel, meals, and similar charges. Generally, employee reimbursement per month is minimal, averaging approximately $1,100 per month.

46. I believe that the relief requested in the Employee Wage Motion is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and will enable the

Debtor to continue to manage its business operations in chapter 11 without disruption. Accordingly, I respectfully submit that the Employee Wage Motion should be approved.

**D. Utility Motion**

47. Pursuant to the Utility Motion, the Debtor seeks entry of interim and final orders, the proposed forms of which are attached thereto: (a) prohibiting utility companies (each, a "Utility," and collectively, the "Utilities") from altering, refusing, or discontinuing services to the Debtor; (b) authorizing and approving the amount and method by which the Debtor may furnish the Utilities with adequate assurance of payment for post-petition utility services; and (c) granting related relief.

48. In connection with operating its business and managing its properties, numerous Utilities provide the Debtor with utility services, such as telephone and communications, electricity, water, internet, and other similar services that are necessary for the continued operation of the Debtor's day-to-day affairs. A list of all identified Utilities (the "Utility Service List") and proposed Adequate Assurance Deposits is attached as Exhibit A to the Utility Motion.

49. Uninterrupted Utility services are essential to the Debtor's ongoing operations, and, therefore, to the success of the Debtor's reorganization efforts. Indeed, any disruption in Utility services—even for a brief period of time—would seriously disrupt the Debtor's continued operations. Such a disruption would negatively impact the Debtor's business operations and revenue and could jeopardize the Debtor's reorganization efforts and, ultimately, creditors' recoveries.

50. I believe that the relief requested in the Utility Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue

to manage its businesses in chapter 11 without disruption. Accordingly, I respectfully submit that the Utility Motion should be approved.

**E. Insurance Motion**

51. The Debtor seeks entry of an order authorizing, but not directing, the Debtor to continue and, to the extent necessary, revise, extend, renew, supplement, or change their prepetition Insurance Policies, or enter into new policies, if necessary, in the ordinary course of business, pay all prepetition obligations in respect thereof, including brokerage and administrative fees, and pay post-petition obligations in respect thereof (collectively, the "Insurance Obligations").

52. In connection with its business operations, the Debtor maintains multiple Insurance Policies that vary in amounts and types of coverage in accordance with prudent business practices, state and local laws governing the jurisdictions in which the Debtor operates and various contractual obligations. The Insurance Policies include general liability, automobile, umbrella liability, directors' and officers' liability, cyber, workers' compensation and employers' liability.

53. The total annual premiums under the current Insurance Policies are approximately $36,000, including all related fees and charges.

54. The Debtor does not believe there are any prepetition amounts owing to the Insurance Carriers with respect to the Insurance Policies. In an abundance of caution, the Debtor seeks authority to pay any prepetition amounts in respect of the Insurance Policies, in an amount not to exceed $36,000 and to continue to pay post-petition costs with respect to the Insurance Policies in the ordinary course of business during the pendency of this Case.

55. The coverage provided under the Insurance Policies is essential for preserving the value of the Debtor's assets and, in many instances, such coverage is required by various

regulations, laws and contracts that govern the Debtor's business operations. Moreover, I understand that maintenance of insurance policies is required by the operating guidelines established by the Office of the United States Trustee. If the Debtor fails to perform its obligations under the Insurance Policies, its coverage thereunder could be voided. The Debtor may also need to renew or replace certain of the Insurance Policies during the course of this Case, or enter into new policies. If the Debtor does not pay prepetition amounts owing in respect of the Insurance Policies, there is a risk that the Insurance Carriers will refuse to renew the Insurance Policies.

56. For the reasons already set forth herein and in the Insurance Motion, I believe the relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm to the Debtor, for the Debtor to operate its business without interruption, and to preserve value for the Debtor's estate.

**F. Tax Motion**

57. Through the Tax Motion, the Debtor seeks an order (i) authorizing, but not directing, the Debtor to pay certain prepetition taxes, including, franchise fees, property taxes, and similar taxes and fees in the ordinary course of business, as the Debtor, in its sole discretion, deems necessary, (ii) authorizing banks and other financial institutions (the "Banks") to honor and process check and electronic transfer requests related to the foregoing, and (iii) granting related relief.

58. In the ordinary course of business, the Debtor incurs or collects and remits certain taxes including franchise, property and various other taxes, fees, charges, and assessments (the "Taxes and Fees"). The Debtor remits such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "Taxing Authorities") in connection with the operation of its business. The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the

respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.  As of the Petition Date, the Debtor believes that none of the Taxes and Fees is past due or delinquent.

59. The Debtor seeks authority to pay all prepetition Taxes and Fees in the ordinary course of business owed to the Taxing Authorities; <u>provided</u> that payments on account of Taxes and Fees that accrued, in whole or in part, prior to the Petition Date but were not in fact paid or processed prior to the Petition Date shall not exceed $24,000 in the aggregate.

60. Any regulatory dispute or delinquency that impacts the Debtor's ability to conduct business in a particular jurisdiction could have wide-ranging and adverse effects on the Debtor's operations as a whole and on the value of its estate.  Specifically, the Debtor's failure to remit the Taxes and Fees could adversely affect the Debtor's business operations because, among other things (a) the Taxing Authorities could initiate audits of the Debtor or seek to prevent the Debtor from continuing its business and administering its estate, which, even if unsuccessful, would unnecessarily divert the Debtor's attention from the process of maximizing the value of the estate; (b) the Taxing Authorities could attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estate; (c) some of the Taxing Authorities may seek to collect penalties, cancel licenses, or undertake other unfavorable enforcement actions if the Debtor does not pay the Taxes and Fees; and (d) certain of the Debtor's directors, officers, and employees might be subject to personal liability, even if such a failure to remit such Taxes and Fees was not a result of malfeasance on their part, which would undoubtedly distract these key people from their duties related to the Case.

61. Further, the Debtor's payment of the Taxes and Fees is an exercise of sound business judgment and is necessary to maximize the value of the Debtor's estate for the benefit of creditors.

Any disputes with taxing authorities could adversely affect their ability to conduct business in a particular jurisdiction and have wide-ranging and negative effects on the Debtor's operations as a whole and its efforts to efficiently administer the estate and maximize distributions to its creditors. If the Debtor does not continue paying the Taxes and Fees when they come due on a timely basis, it is possible that Taxing Authorities, or those parties who ordinarily collect the Taxes and Fees, may interfere with the Debtor's business and the efficient administration of the estate.

62. For the reasons already set forth herein and in the Tax Motion, I believe the relief requested in the Tax Motion is necessary to avoid immediate and irreparable harm to the Debtor, for the Debtor to operate its business without interruption, and to preserve value for the Debtor's estate.

**G. Critical Vendor Motion**

63. The Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay the prepetition claims of certain vendors that are critical to the Debtor's operations, as more fully described herein and in the Critical Vendor Motion (the "Critical Vendor Claims") up to $60,000 and $149,000 on an interim and final basis, respectively.

64. The Debtor has a number of key relationships with vendors who provide essential goods and/or services to the Debtor in the ordinary course of business (the "Critical Vendors"). The Debtor believes that if they cannot continue the relationships with the current Critical Vendors, it may be impossible to continue doing business.

65. In any event the amount of capital required to obtain similar goods or comparable services (if at all possible after a default under an agreement with a Critical Vendor) would be much greater than the combined total of making payments on the past due amounts to the Critical Vendors and the likely payments required on account of post-petition goods and services.

66. The Debtor believes that they must continue to receive the goods and services provided by the Critical Vendors in order to achieve a successful reorganization. In some cases, the Debtor believes that absent payment of prepetition amounts due, the Critical Vendors may refuse to deliver any goods and services on an ongoing basis even if the Debtor can pay post-petition amounts due.

67. Ultimately, the Debtor believes that its ability to continue operations at the efficient and high-quality levels needed to reorganize successfully will largely depend on the continued participation of the Critical Vendors. The Debtor, along with its restructuring advisors, have performed an analysis of the payments to Critical Vendors necessary to avoid potentially significant disruptions to the Debtor's business operations. The Debtor believes that a fund of $149,000 in the aggregate should provide the flexibility necessary for the Debtor to receive the vital goods and/or services they require to continue being successful as a reorganized entity.

I declare under penalty of perjury that, to the best of my knowledge after reasonable inquiry, the foregoing is true and correct.

Dated: June 14th, 2022

_____
Hubert Ho, Chief Operating Officer and Chief Financial Officer of Medical Technology Associates II dba 8BioMed