**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MEDICAL TECHNOLOGY ASSOCIATES II, INC., | Case No. 22-10534 (CTG) |
| Debtor.[1] | |

## SECOND AMENDED SUBCHAPTER V PLAN OF REORGANIZATION OF MEDICAL TECHNOLOGY ASSOCIATES II, INC.

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on this Plan. To assist you in your review, please note that a list of definitions appears at the beginning of this document.

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR DECEMBER 28, 2022, AT 1:00 P.M. (PREVAILING EASTERN TIME) IN COURTROOM NO. 7 AT THE U.S. BANKRUPTCY COURT, DISTRICT OF DELAWARE, 824 N. MARKET STREET, WILMINGTON, DELAWARE 19801. YOUR RIGHTS MAY BE AFFECTED BY THIS PLAN. YOU SHOULD CONSIDER DISCUSSING THIS DOCUMENT WITH AN ATTORNEY.**

Dated: December 22, 2022
Wilmington, DE

Respectfully submitted,

GELLERT SCALI BUSENKELL & BROWN, LLC

*/s/ Michael Busenkell*
Michael Busenkell (DE 3933)
Ronald S. Gellert (DE 4259)
Bradley P. Lehman (DE 5921)
1201 N. Orange St., Ste. 300
Wilmington, Delaware 19801
Telephone: (302) 425-5800
Facsimile:  (302) 425-5814
mbusenkell@gsbblaw.com
rgellert@gsbblaw.com
blehman@gsbblaw.com

*Attorneys for Debtor and Debtor in Possession*

---

[1] The last four digits of the Debtor's U.S. tax identification number are (3760).  The Debtor's mailing address is 1176 Tourmaline Dr., Thousand Oaks, CA 91320.
.

## I.    DEFINITIONS AND CONSTRUCTIONS OF TERMS

The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Code are used in this Plan. The definitions that follow that are found in the Bankruptcy Code and are for convenience of reference only and are superseded by the definitions found in the Bankruptcy Code.  A term used in this Plan that is not defined herein but that is used in the Bankruptcy Code shall have the meaning ascribed to that term in the Bankruptcy Code.

"**503(b)(9) Claim**" means any Claim against the Debtor for the value of goods sold to Debtor in the ordinary course of business and received by Debtor within twenty (20) days before the Petition Date, which qualifies as an administrative expense pursuant to 11 U.S.C. § 503(b)(9).

"**Administrative Expense Bar Date**" means the deadline set forth in Article V herein.

"**Administrative Expense Claim**" means any right to payment constituting actual and necessary costs or expenses of administration of the Chapter 11 Case under sections 503(b) and 507(a)(2) of the Bankruptcy Code including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estate and (b) any fees or charges assessed against the Estate under section 1930 of chapter 123 of Title 28 of the United States Code but excluding Professional Claims.

"**Administrative Expense Claim Objection Deadline**" means the deadline set forth in Article V herein.

"**Administrative Expense Request**" means a request for payment of an Administrative Expense Claim that is to be filed in accordance with Article V of this Plan.

"**Affiliate**" means an "affiliate" as defined under Bankruptcy Code section 101(2).

"**Allowed Claim**" means any Claim against the Debtor (a) as to which no objection or request for estimation has been filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court or this Plan for such Claim or (b) is not a Disputed Claim or a Disallowed Claim; *provided*, *however*, that a Disputed Claim shall become an Allowed Claim to the extent (ii) an objection to such Claim has been interposed but withdrawn or overruled by a Final Order of the Bankruptcy Court, or (ii) the Bankruptcy Court enters a Final Order providing that such Claim is an Allowed Claim.

"**Assets**" means all of the assets of the Debtor of any nature whatsoever, including, without limitation, all property of the Estate, as defined by section 541 of the Bankruptcy Code, Cash, Causes of Action, accounts receivable, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and the proceeds of all of the foregoing.

"**Avoidance Actions**" means Causes of Action arising under Bankruptcy Code sections 502, 510, 541, 544, 545, 547, 548, 549, 550, 551, or 553, or under related state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such Causes of Action.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Bar Date**" means the applicable bar date by which Proofs of Claim or requests for allowance and payment of Administrative Expense Claims or Professional Fee Claims must be, or must have been, filed.

"**Business Day**" means any day, other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

"**Cash**" means cash, cash equivalents and other readily marketable securities or instruments issued by a person other than the Debtor, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks and commercial paper of any entity, including interest accrued or earned thereon.

"**Cash on Hand**" means all Cash in Debtor's possession or control as of the Effective Date, including Debtor's interest in any Cash held in reserves, security deposits and/or retainers, plus all Settlement Cash, if any, whenever received.

"**Causes of Action**" means any Claim, cause of action (including Avoidance Actions), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, or franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**Chapter 11 Case**" means this case under chapter 11 of the Bankruptcy Code in which Medical Technology Associates II, Inc. is the Debtor in Possession.

"**Claim**" means "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

"**Claims Objection Deadline**" means one hundred twenty (120) days after the Effective Date or such later date as may be approved by the Bankruptcy Court; *provided*, *however*, that for Administrative Expense Claims, such deadline shall be the Administrative Expense Claim Deadline.

"**Claims Register**" means the official register of Claims maintained by the Clerk.

"**Class**" means any group of substantially similar Claims or Equity Interests classified by the Plan pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).

"**Clerk**" means the Clerk of the Bankruptcy Court.

"**Collateral**" means any property or interest in property of the Estate subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or other applicable law.

"**Confirmation**" means entry of the Confirmation Order by the Bankruptcy Court on the Docket.

"**Confirmation Date**" means the date on which the Confirmation Order is entered on the Docket.

"**Confirmation Hearing**" means the hearing before the Bankruptcy Court at which the Debtor will seek entry of the Confirmation Order, as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" means the Final Order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1191.

"**Consummation**" means the occurrence of the Effective Date.

"**Contingent**" means, with respect to any Claim or Interest, or any portion thereof, except as otherwise provided herein, any contingent or unliquidated Claim asserted or which may be asserted against Debtor.

"**Creditor**" means any Person that is the Holder of a Claim against the Debtor.

"**Cure**" means the payment of Cash by Debtor, or the distribution of property (as the parties may agree or the Bankruptcy Court may order), as necessary to cure monetary defaults under an Executory Contract of Debtor and to permit Debtor to assume such Executory Contract under Bankruptcy Code section 365(a).

"**Debtor**" or "**Debtor in Possession**" means the Debtor in Possession in this Chapter 11 Case, Medical Technology Associates II, Inc.

"**DIP Agreement**" means the Debtor in Possession Credit and Security Agreement attached to the DIP Financing Order as Exhibit 1, as may be amended or modified with the consent of the DIP Lender.

"**DIP Documents**" has the meaning given in the DIP Financing Orders.

"**DIP Financing**" has the meaning given in the DIP Financing Orders.

"**DIP Lender**" means Gold Blaze Ltd.

"**DIP Financing Orders**" means the Final DIP Financing Order and the DIP Upsize Order.

"**DIP Lender Claims**" means any Claim arising under the DIP Financing or the DIP Financing Orders, including all Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations.

"**DIP Obligations**" has the meaning given in the DIP Financing Orders.

"**DIP Upsize Motion**" means that certain Motion of the Debtor for Entry of an Order Authorizing the Debtor to Enter into the DIP Amendment [D.I. 195] filed on November 11, 2022.

"**DIP Upsize Order**" means any order approving the DIP Upsize Motion.

"**Disallowed**" means any Claim against the Debtor or any portion thereof that (i) has been disallowed by a Final Order, (ii) is Scheduled as zero or as contingent, disputed or unliquidated and as to which no proof of claim or Administrative Expense Request has been filed or deemed filed with the Bankruptcy Court under either the Bankruptcy Code or any Final Order or otherwise deemed filed under applicable law or this Plan, (iii) is not Scheduled and as to which no proof of claim or Administrative Expense Request has been filed or deemed filed with the Bankruptcy Court under either the Bankruptcy Code or any Order or otherwise deemed filed under applicable law or this Plan, (iv) has been withdrawn by agreement of the Debtor and the Holder thereof, or (v) has been withdrawn by the Holder thereof.

"**Disposable Income**" means "disposable income" as defined under Bankruptcy Code section 1191(d).

"**Disputed**" means any Claim against the Debtor or any portion thereof that (i) has not been Scheduled by the Debtor or has been Scheduled as unknown, contingent, unliquidated, disputed or at zero, if such Claim is not the subject of a proof of claim, or (ii) is the subject of an objection interposed by the Claims Objection Deadline or such other time period fixed by the Bankruptcy Court, which has not been withdrawn or overruled by a Final Order; *provided*, *however*, that a Claim shall not be a Disputed Claim to the extent it becomes an Allowed Claim or Disallowed Claim.

"**Distribution**" means Cash, property, interests in property, or other value to be distributed by the Reorganized Debtor to Holders of Allowed Claims, or their designated agents, under the Plan.

"**Docket**" means the docket in the Chapter 11 Case maintained by the Clerk.

"**Effective Date**" means the first Business Day on which the conditions specified in Article XII of the Plan have been met, satisfied, and/or waived.

"**Entity**" means an "entity" as defined under Bankruptcy Code section 101(15).

"**Equity Interests**" or "**Interests**" means any "equity security" in the Debtor as defined under Bankruptcy Code section 101(16), including, without limitation, all issued, unissued, authorized or outstanding ownership interests (including common and preferred) or other equity interests, together with any warrants, options, convertible securities, liquidating preferred securities or

contractual rights to purchase or acquire any such equity interests at any time and all rights arising with respect thereto.

"**Estate**" means the estate of Debtor created upon the commencement of the Chapter 11 Case pursuant to Bankruptcy Code section 541.

"**Exculpated Parties**" means the following Persons and Entities, each in their respective capacities as such, (a) the Debtor; (b) the Professionals; and (c) all directors and officers of the Debtor who served during any portion of the Chapter 11 Case.

"**Executory Contract**" means any executory contract to which the Debtor is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

"**Final Decree**" means the order entered pursuant to Bankruptcy Code section 350, Bankruptcy Rule 3022, and Local Rule 3022-1 closing the Chapter 11 Case.

"**Final DIP Financing Order**" means the *Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363(C), 364(C)(1), 364(C)(2), 364(D)(1), 364(E) And 507 (I) Authorizing Debtor To (A) Obtain Postpetition Secured Financing; (II) Modifying The Automatic Stay; (III) Scheduling A Final Hearing And (IV) Granting Certain Related Relief* [D.I. 115], entered by the Bankruptcy Court on August 15, 2022.

"**Final Order**" means an Order of the Bankruptcy Court or a Court of competent jurisdiction to hear appeals from the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal, to petition for certiorari, or to move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending.

"**General Bar Date**" means August 15, 2022, the deadline for each Person or Entity, other than a Governmental Unit, to file a Proof of Claim against the Debtor for a Claim that arose prior to the Petition Date, as established pursuant to the *General Order—Order Setting Proof of Claim Bar Dates in All Cases Under Subchapter V of Chapter 11*, dated September 12, 2020.

"**General Unsecured Claims**" means, collectively, any Claim against Debtor that is not (a) a Priority Unsecured Claim, (b) an Administrative Expense Claim, (c) a Professional Fee Claim, (d) a Priority Tax Claim, (e) a Secured Claim, (f) any Claim that constitutes an Equity Interest, or (g) any Claim entitled to priority treatment under the Bankruptcy Code or any order of the Bankruptcy Court.  The term General Unsecured Claim shall explicitly include the Gold Blaze Prepetition Claim and the WTE Claim.

"**Gold Blaze**" means Gold Blaze Ltd.

"**Gold Blaze Loan Payable**" means the $10,250,000 million principal amount, plus accrued interest, owed by the Debtor, as of June 14, 2022, on an unsecured loan payable to Gold Blaze pursuant to the Unsecured Loan/Line of Credit Agreement dated March 4, 2021 between Debtor and Gold Blaze.

"**Gold Blaze Prepetition Claim**" means the Allowed General Unsecured Claim of Gold Blaze arising out of the Gold Blaze Loan Payable.

"**Governmental Unit**" means a "governmental unit" as defined under Bankruptcy Code section 101(27).

"**Governmental Unit Bar Date**" means December 12, 2022, the deadline for a Governmental Unit to file a Proof of Claim against the Debtor for a Claim that arose prior to the Petition Date, as established pursuant to the *General Order—Order Setting Proof of Claim Bar Dates in All Cases Under Subchapter V of Chapter 11*, dated September 12, 2020.

"**GUC Pool**" means Cash in the amount of $150,000 to be funded on or after the Effective Date from Cash on Hand or proceeds of the Plan Note.

"**Holder**" means the beneficial holder of any Claim or Interest.

"**Impaired**" means, with respect to any Class, a Class that is impaired within the meaning of Bankruptcy Code sections 1123(a)(4) and 1124.

"**Lien**" means "lien" as defined under Bankruptcy Code section 101(37).

"**Liquidation Value**" means the amount that would be realized if the Debtor's assets were sold and liquidated under chapter 7 of the Bankruptcy Code.

"**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

"**New Equity Interests**" means the new shares in the Reorganized Debtor to be issued to the DIP Lender on the Effective Date.

"**Over-Advance**" has the meaning given in Article III.E.

"**Malvern Lease**" means collectively, that certain Lease Agreement, dated as of December 29, 2017, between WPT, as landlord, and the Debtor, as tenant, a First Amendment to Lease Agreement dated as of June 6, 2019, between WPT and the Debtor, and a Partial Lease Termination Agreement dated as of July 9, 2021, between WPT and the Debtor under which the Debtor leases certain non-residential real property located at 257-275 Great Valley Parkway, Malvern, PA 19355.

"**Newco**" means the entity to be designated by the DIP Lender.

"**Newco Assets**" means all assets of the Reorganized Debtor other than (i) any and all claims and Causes of Action of the Debtor against Carl W. Rausch, (ii) any and all claims and Causes of Action of the Debtor against World Technology East II Limited, (iii) the proceeds of the Plan Note, (iv) the Provisional Patent Applications, and (v) any other assets designated by the DIP Lender to be excluded from Newco Assets prior to the Effective Date.

"**Patent Applications**" means the following: (i) U.S. Patent Application No. 62/557,324, filed on September 12, 2017 (and corresponding PCT application, PCT/US2018/050623, filed on September 12, 2018); (ii) U.S. Patent Application No. 62/914,118, filed on October 11, 2019 (and corresponding PCT application, PCT/US2020/054985, filed on October 9, 2020), and (iii) U.S. Patent Application No. 17/150,210, filed on January 15, 2021, which claims priority to U.S. Patent Application No. 62/962,561, filed in January 2020  (itself a re-filing of U.S. Patent Application No. 62/936,945, filed in November 2019).

"**Person**" means a "person" as defined under Bankruptcy Code section 101(41).

"**Petition Date**" means June 14, 2022, the date on which the Debtor filed its voluntary petition for relief electing treatment under subchapter V of chapter 11 of the Bankruptcy Code.

"**Plan**" means this Subchapter V Plan of Reorganization including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

"**Plan Documents**" means the Plan and the Plan Supplement.

"**Plan Note**" means that certain secured promissory note in a principal amount of $500,000 subject to adjustment as agreed between the Plan Note Lender and the Reorganized Debtor.

"**Plan Note Documents**" means the definitive documentation of the Plan Note in form and substance acceptable to the Plan Note Lender and all related documents, including guarantees and security agreements.

"**Plan Note Lender**" means the DIP Lender or its designee as lender under the Plan Note.

"**Plan Note Liens**" means Liens and security interests created pursuant to this Plan, the Confirmation Order, and the Plan Note Documents.

"**Plan Supplement**" means, collectively, the documents, schedules, and exhibits to the Plan to be filed by the Debtor in advance of the Confirmation Hearing and shall include, without limitation, true and correct copies of (i) the Plan Note Documents; (ii) a schedule of retained Causes of Action; (iii) the identity and compensation of the officers and director of the Reorganized Debtor; (iv) the amended certificate or articles of incorporation and bylaws, if any, and (iv) liquidation analysis. The Debtor shall have the right to amend any and all documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

"**Priority Tax Claims**" means, collectively, any Claim of a Governmental Unit of a kind specified under Bankruptcy Code section 507(a)(8) and/or Bankruptcy Code section 502(i).

"**Priority Unsecured Claims**" means, collectively, any Claim, other than an Administrative Claim or a Priority Tax Claim, which is entitled to priority under Bankruptcy Code section 507(a).

"***Pro Rata***" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular

Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

"**Professional**" means an Entity employed pursuant to a Bankruptcy Court order in accordance with Bankruptcy Code section 327 and to be compensated for services rendered before or on the Confirmation Date, pursuant to Bankruptcy Code sections 327, 328, 329, 330, or 331, including, for the avoidance of doubt, the Subchapter V Trustee and any Professional he retains.

"**Professional Fee Claims**" means, collectively, means any and all Claims of a Professional seeking a payment of compensation for services rendered or reimbursement of expenses incurred on or as of the Petition Date and through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

"**Professional Fee Claims Bar Date**" means the deadline set forth in Article V.B. of this Plan.

"**Proof of Claim**" means a proof of Claim or Interest filed against the Debtor in the Chapter 11 Case.

"**Rausch Adversary Proceeding**" means the adversary proceeding captioned as *Medical Technology Associates II, Inc. v. Carl W. Rausch, et al.*, Adv. Pro. No. 22-50389 (CTG), which was commenced by the Debtor on July 12, 2022, and is presently pending before the Bankruptcy Court.

"**Rejection Claims**" means, collectively, any Claim arising from, or relating to, the rejection of an Executory Contract or Unexpired Lease pursuant to Bankruptcy Code section 365(a) by the Debtor, as limited, in the case of a rejected Unexpired Lease, by Bankruptcy Code section 502(b)(6).

"**Rejection Claims Bar Date**" means the deadline set forth in Article VIII.B. of this Plan.

"**Related Parties**" means, with respect to any Person or Entity, such Person's or Entity's current and former direct or indirect subsidiaries and affiliates and each of their respective current and former stockholders, members, limited partners, general partners, equity holders, directors, managers, officers, employees, agents, designees, attorneys, financial advisors, investment bankers, accountants, and other professionals or representatives.

"**Released Parties**" means the following Persons or Entities: (a) the DIP Lender, (b) the Debtor, and (c) all Related Parties of the foregoing in their capacity as such; provided, however, that neither Rausch nor WTE2 shall be Released Parties under any circumstances.

"**Reorganized Debtor**" means Debtor upon and after the Effective Date of this Plan.

"**Schedules and Statements**" means the Schedules of Assets and Liabilities and Statements of Financial Affairs filed by the Debtor under Bankruptcy Code section 521 and Bankruptcy Rule 1007, and all amendments and modifications thereto.

"**Secured Claims**" means, collectively, any Claim which is: (a) secured by a valid and perfected Lien in Collateral, which is enforceable pursuant to applicable law (i) as set forth in the Plan, (ii)

as agreed to by the Holder of such Claim and the Debtor, or (iii) as determined by a Final Order; or (b) subject to a valid right of setoff under Bankruptcy Code section 553, in each case, as determined pursuant to Bankruptcy Code section 506(a).

"**Settlement Cash**" means the Cash received by the Debtor or Reorganized Debtor from the settling parties under that certain Binding Term Sheet with an effective date of November 28, 2022 [D.I. 231-1] and any further settlement agreement between the parties thereto formalizing such Binding Term Sheet.

"**Subchapter V Trustee**" means Richard E. Furtek, appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1183(a) and 28 U.S.C. § 586(e).

"**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

"**Unexpired Lease**" means a lease of real property to which the Debtor is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

"**Unimpaired**" means, with respect to a Class of Claims of Equity Interests, a Claim or an Equity Interest that is "unimpaired" within the meaning of Bankruptcy Code section 1124.

"**WPT**" means WPT Land 2 LP, the landlord under the Malvern Lease.

"**WTE2 Claim**" means the claim filed by World Technology East II Limited on August 15, 2022 in the Chapter 11 Case and which has been denominated claim no. 10 by the Clerk.

## II.    INTRODUCTION AND CONCISE SUMMARY OF PLAN

Pursuant to Bankruptcy Code sections 1129, 1190, and 1191, the Debtor proposes this Plan, which, subject to Confirmation and the Effective Date, will form a binding contract between the Debtor and all Holders of Claims or Interest and other parties in interest that shall govern, among other things, the treatment and/or payment of Allowed Claims or Interests.  Capitalized terms used in this Plan and not otherwise defined have the meanings ascribed to such terms in Article I of this Plan.

This Plan is designed to permit Debtor to resolve all Claims and Interests, whether manifested or unmanifested, of all Holders of Claims or Interests, whether known or unknown. This Plan provides for the full payment of administrative and priority claims as soon as practicable following the Effective Date. Specifically, this Plan is a chapter 11 plan of reorganization that accomplishes a number of beneficial outcomes for the Debtor and its creditors, including, among other things:

- **Emergence from Chapter 11 and Post-Emergence Operations**: Except as otherwise provided in this Plan, the Reorganized Debtor shall continue to exist on and after the Effective Date as a Delaware corporation, with all of the powers of such an entity under the laws of the State of Delaware and as provided under the Debtor's governing documents in effect following the Effective Date.  Moreover, all Assets comprising the Estate shall vest in the Reorganized Debtor free and clear of all Liens, Claims, charges, and other

encumbrances. Specifically, upon the Effective Date, the following assets, among others, shall revest in the Reorganized Debtor: (i) the Debtor's Cash and Cash equivalents; (ii) certain investments made by the Debtor in non-Debtors; (iii) the Debtor's leased real property and all fixtures thereon to the extent the any related applicable Unexpired Leases are not otherwise rejected pursuant to this Plan or otherwise; (iv) the Debtor's machinery and equipment and office furniture; (v) the Debtor's intellectual property and trademarks, including without limitation any and all interest of the Debtor in the Provisional Patent Applications; and (vi) all Causes of Action including, among others, all Avoidance Actions and all Causes of Action against Rausch or WTE2. Further, the Reorganized Debtor shall not assume any Claims or liabilities of the Debtor, except as specifically provided herein, which Claims or liabilities shall be discharged as against the Reorganized Debtor. The Reorganized Debtor shall thereafter transfer the Newco Assets to Newco which will operate the Newco Assets. The Debtor has determined that Newco operating the Newco Assets post-emergence is necessary to retain and attract talented employees and to potentially solicit additional investments.

- **Funding of Plan Distributions**: On the Effective Date, the Reorganized Debtor shall execute the Plan Note Documents, pursuant to which certain funding will be made available to the Reorganized Debtor subject to the terms and conditions set forth in the Plan Note Documents. This will ensure the Reorganized Debtor has funds to make Distributions to Holders of Allowed Claims as provided in this Plan.

- **Distributions to General Unsecured Claim Holders**: Finally, this Plan provides for distributions to Holders of Allowed General Unsecured Claims far in excess of what is required under the Bankruptcy Code.

Copies of this Plan and all other pleadings that have been or will be filed in the Chapter 11 Case are available for review without charge by contacting the Debtor's counsel at Gellert Scali Busenkell & Brown, LLC, 1201 N. Orange Street, Suite 300, Wilmington, DE 19801 (ATTN: Michael Busenkell, Esq.) or via e-mail at mbusenkell@gsbblaw.com.

ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.

Subject to any restrictions on modifications as set forth under the Bankruptcy Code and the Bankruptcy Rules, the Debtor expressly reserves the right to alter, amend or modify this Plan one or more times before its substantial consummation.

## III.    BACKGROUND

### A.    Brief Description and History of Debtor's Business

The Debtor is a biopharmaceutical company focused on the research and development ("**R&D**") and future manufacturing and commercialization of hemoglobin-based oxygen carrier ("**HBOC**") for various indications and applications related to the use of blood, including trauma and organ preservations. The Debtor was established in 2015 as a Delaware company, with a current principal place of business and its home office at 1176 Tourmaline Dr., Thousand Oaks, CA 91320.  It finished its Series A and B rounds of funding between 2017 and 2019, fitted out its R&D and manufacturing facility in Malvern, Pennsylvania between 2018 and 2019, and relocated its principal office to California between 2020 and 2022. It is also doing business as "8BioMed."

### B.    Organizational Structure, Governance, and Current Management

By board consent dated June 30, 2017, Carl Rausch ("**Rausch**"), as sole director, appointed himself as President, Treasurer and Secretary. At the same time Rausch appointed Conroy Chi-Heng Cheng ("**Cheng**") as Treasurer.

By board consent dated September 17, 2017, the Debtor's board of directors authorized the issuance of shares of common stock to New World Technology II, LLC ("**NWT II**"), an entity controlled by Rausch, and to Cheng personally. The board consent also authorized the issuance of Series A Preferred Stock and expanded the size of the Debtor's board of directors to three members:  Rausch, Cheng, and Xiaowei (Echo) Hu.

The Debtor's authorized capitalization consists of 75,000,000 shares of common stock and 25,000,000 shares of preferred stock. Fifteen million shares of preferred stock are designated as Series A Preferred Stock ("**Series A Stock**") and 9,556,873 shares of preferred stock are designated as Series B Preferred Stock ("**Series B Stock**"). The preferred shares are currently convertible into common stock on a 1:1 basis. All authorized classes of stock are voting stock and carry one vote.

As of the Petition Date, there are 45 million outstanding shares of Common Stock, 15 million shares of Series A Stock and 5,934,066 shares of Series B Stock, for a total of 65,934,066 voting shares outstanding.  The Debtor's outstanding shares are held as follows:

| Holds or controls | Shares by class/series | Total Shares | %[2] |
|---|---|---|---|
| Rausch | 30,000,000 Common Stock via New World Technology II, LLC | 30,000,000 | 45.50 |
| Cheng | 15,000,000 Common Stock individually and 2,967,033 Series B Stock through Gold Blaze Ltd. | 17,967,033 | 27.25 |
| Legends Forever Investment Ltd. | 15,000,000 Series A Stock 2,967,033 Series B Stock | 17,967,033 | 27.25 |

[2] Fully diluted and on an as-converted basis.

On November 7, 2018, in connection with authorizing the Series B Preferred Stock issuance, the Debtor's board of directors was further expanded to four members and Haoyuan (Rocky) Chen was designated as the fourth director. Rausch resigned as a director in December 2019 and has not yet been replaced. As a result, there is one vacancy on the board of directors. Therefore, the Debtor currently has three board members.

### C.    Pre-Petition Date Capital Structure and Assets

As of April 30, 2022, the Debtor had current assets of $1.8 million on a book value basis, fixed assets net of depreciation of $10.6 million on a book value basis, and receivables and investments in the amount of $1.8 million and $1 million, respectively.

As of April 30, 2022, the Debtor had outstanding trade debt of approximately $350,000, accrued interest of $988,000.01 on the Gold Blaze Limited Loan Payable, and other miscellaneous current liabilities of approximately $127,910.80.

As of April 30, 2022, the Debtor owed at least $10 million on the Gold Blaze Loan Payable. In addition, Gold Blaze Limited asserted that it overfunded the Gold Blaze Loan Payable in the amount of $500,000.

For the period ending April 2022, the Debtor had net income of ($407,671.89). As a development stage research company, the Debtor had no operating income versus operating expenses of $326,107.22 and other expenses of $84,903.20.

### D.    Events Leading to Bankruptcy

For the four years that Rausch served as President and Chief Executive Officer of the Debtor, he and other Debtor employees worked to develop and improve the Debtor's technology. During that time, Rausch had both a fiduciary and contractual duty to assign his inventions to the Debtor, which duty he repeatedly acknowledged throughout his tenure with the Debtor. However, when it became apparent that he would be removed from his positions with the Debtor, Rausch commenced a plot to position himself and his wholly owned non-Debtor company, World Technology East II Limited ("**WTE2**"), as the owner of the Debtor's intellectual property. Indeed, Rausch reassigned a pending patent application to WTE2, attempted to assign new patent applications to WTE2, and fabricated a contract purporting to license intellectual property from WTE2 to the Debtor. Since his removal, Rausch and WTE2 have continued to claim ownership of the Debtor's patent applications and other intellectual property pursuant to the fake licensing agreement.

Thus, on March 5, 2021, the Debtor filed a lawsuit in the U.S. District Court for the Eastern District of Pennsylvania, Case No. 2:21-cv-1095-MMB (the "**Pre-Petition Action**"), against Rausch and WTE2 seeking, among other things, a declaration that the Debtor is the sole owner of all intellectual property developed by Rausch during his tenure at the Debtor. In response, WTE2 asserted counterclaims against the Debtor, including a counterclaim seeking a declaration that the alleged licensing agreement between WTE2 and MedTech exists and is valid. As of the Petition Date, the District Court was considering a motion by Rausch and WTE2 to compel arbitration of

all the disputes in the Pre-Petition Action. Pursuant to Section 362 of the Bankruptcy Code, the filing of this Chapter 11 Case effectuated a stay of WTE2's counterclaims

As a result of that value-defeating litigation and other headwinds, the Debtor experienced a liquidity crisis and required new investment in order to fund its operations. As of June 12, 2022, the Debtor only had $116,231.23 cash available. Without further capital injection, the Debtor could not continue operations at its current burn rate. Moreover, the Debtor had spent in excess of $3 million in legal fees relating to the litigation with Rausch and WTE2 and was unable to attract new investment with this level of litigation expense and uncertainty.

In addition, the Debtor currently leases property in Malvern, Pennsylvania. The leased property is located at 275 Great Valley Parkway, Malvern, Pennsylvania and consists of approximately 12,000 square feet. The Debtor's current annual rent for the Malvern facility is $157,644 plus common area maintenance expenses. The Debtor has relocated its operations to Thousand Oaks, California and no longer uses the Malvern property. Unfortunately, after a nine month effort by CBRE, there were no viable offers by any parties to take assignment of the Malvern property and purchase the equipment located there. As a result, the Debtor engaged in a process of liquidating the remaining equipment at the Malvern location with Liquidity Services Operations, LLC.

### E.    Events During the Chapter 11 Case

As a result of the circumstances described above, on June 14, 2022, the Debtor commenced this Chapter 11 Case by filing a voluntary petition for relief under chapter 11, subchapter V of the Bankruptcy Code. The Chapter 11 Case is pending in the United States Bankruptcy Court for the District of Delaware. The following is a brief description of the events that have occurred during this Chapter 11 Case

#### 1.    First Day Motions and Orders

At the outset of the Chapter 11 Case, in addition to its voluntary petition, the Debtor filed the following "first day" motions seeking procedural and administrative relief:

| Motion | D.I. |
|---|---|
| *Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtor to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Certain Related Relief* | 4 |
| *Debtor's Motion For Entry Of An Order (I) Authorizing The Debtor To Continue Payroll And Payroll-Related Practices, Including Payment Or Reimbursement Of Certain Prepetition (A) Wages, Salaries, Vacation Pay And Other Compensation And Amounts Withheld From Such Compensation; (B) Employee Health Benefits And Similar Benefits; (C) Reimbursement Of Employee Expenses; And (D) Payment Of All Costs Incident Thereto And (II) Authorizing Applicable Banks And Other Financial Institutions To Receive, Process, Honor And Pay Certain Checks And Transfers* | 5 |

| | |
|---|---|
| *Motion Pursuant To Sections 105 And 366 Of The Bankruptcy Code For Entry Of Interim And Final Orders (I) Prohibiting Utility Companies From Altering, Refusing Or Discontinuing Services To, Or Discriminating Against, The Debtor, (II) Determining That The Utility Companies Are Adequately Assured Of Postpetition Payment And (III) Establishing Procedures For Resolving Requests For Additional Adequate Assurance* | 6 |
| *Debtor's Motion For Interim And Final Orders (I) Authorizing, But Not Directing, Payment Of Prepetition Sales, Use, Property, And Franchise Taxes And Similar Taxes And Fees And (II) Authorizing Banks And Other Financial Institutions To Receive, Process, Honor, And Pay Checks Issued And Electronic Payment Requests Made Relating To The Foregoing* | 7 |
| *Debtor's Motion For Entry Of Interim And Final Orders Authorizing The Debtor To (I) Maintain, Continue, And Renew Their Property, Casualty, Liability And Other Insurance Policies And Agreements, And (II) Honor All Obligations In Respect Thereof* | 8 |
| *Debtor's Motion For An Order (I) Authorizing The Debtor To (A) Continue And Maintain Its Consolidated Cash Management System, (B) Continue And Maintain Its Existing Bank Accounts And (C) Use Existing Business Forms; (II) Waiving The Requirements Of Bankruptcy Code Section 345(B); And (III) Granting Related Relief* | 9 |

On June 16, 2022 the Bankruptcy Court held a hearing following which, among other things, it granted each of the above motions on an interim basis. Subsequently, on July 7 and 8, the Bankruptcy Court entered orders granting each of the above motions on a final basis.

### 2. Retention of Professionals and Appointment of the Subchapter V Trustee

On June 21, 2022, the Debtor filed applications to retain Gellert Scali Busenkell & Brown, LLC as its bankruptcy counsel; Gavin/Solmonese LLC to provide its Chief Restructuring Officer, Stanley W. Mastil, and other professionals, and Hangley Aronchick Segal Pudlin & Schiller as its special litigation counsel [D.I.s 37, 39, and 40], which retentions were approved by orders entered by the Bankruptcy Court on May 21, 2020 [D.I. 60, 62, and 64]. Additionally, on June 21, 2022, the Bankruptcy Court entered an order approving the Debtor's retention of certain professionals utilized in the ordinary course of its business [D.I. 61]. Finally, on August 5, 2022, the Debtor filed an application to retain CBRE, Inc. as its real estate broker [D.I. 104], which application was approved by the Bankruptcy Court on August 22, 2022 [D.I. 121]. In addition to the professionals retained by the Debtor, on June 15, 2022, the U.S. Trustee appointed Richard E. Furtek to serve as the Debtor's Subchapter V Trustee.

### 3. Post-Petition Financing

Subsequently, on July 15, 2022, the Debtor filed a motion to approve the DIP Financing (the "**DIP Financing Motion**") [D.I. 78], by which the Debtor sought the Bankruptcy Court's approval of the DIP Financing provided by Gold Blaze as the DIP Lender in order to finance the Debtor's post-petition operations pending the filing of this Plan. In order to secure the amounts advanced under the DIP Facility, the Debtor proposed to grant the DIP Lender senior, super priority liens on certain prepetition collateral (described in the DIP Financing Motion), and modify

the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents. The Bankruptcy Court entered an Order granting the relief requested in the DIP Financing Motion on an interim basis on July 25, 2022 [D.I. 93], and thereafter entered the Final DIP Financing Order on August 15, 2022 [D.I. 115].

While the DIP Financing Motion sought approval of DIP Financing in an amount up to and including $1,500,000, the ultimate amount of the DIP Facility and the DIP Lender's resulting DIP Lender Claims was also subject to the Bankruptcy Court's determination of the treatment of $500,000 prepetition over-advance (the "**Over-Advance**") made by the DIP Lender to the Debtor in February 2022.   On October 4, 2022, the Court entered an order [D.I. 153] approving a settlement agreement resolving the treatment of the Over-Advance.  Through that agreement (i) $250,000 of the Over-Advance was deemed to be Assets of the Debtor's Estate resulting in an increase to the Gold Blaze Prepetition Claim of  $250,000 and the remaining $250,000 of the Over-Advance was deemed to be property of Gold Blaze subsequently lent to the Debtor as a part of the DIP Financing, increasing the total amount of the maximum DIP Obligations (as of October 4, 2022) to $1,250,000.

On November 10, 2022, the Debtor filed the DIP Upsize Motion which seeks to increase the limit of financing approved under the Final DIP Financing Order from $1.25 million to $2 million.

### 4.   Post-Petition Litigation

On July 12, 2022, the Debtor commenced the adversary proceeding captioned as *Medical Technology Associates II, Inc. v. Carl W. Rausch, et al.*, Adv. Pro. No. 22-50389 (CTG), by which the Debtor seeks declaratory judgment determining the ownership of the Patent Applications. In response, the Defendants filed a counterclaim concerning the ownership of the Patent Applications, along with a Motion for Partial Relief from the Automatic Stay, to Dismiss this Adversary Proceeding Pursuant to the First-Filed Rule or, in the Alternative, To Compel Arbitration and Stay this Action (the "**Lift Stay Motion**"), seeking to compel litigation of all disputes through the Pre-Petition Action. The Debtor also moved for summary judgment and to partially dismiss Defendants' counterclaims.  The Court heard oral argument on such matters on October 25, 2022.  Thereafter, the Court issued its Memorandum Opinion [Adv. No 22-10534, D.I. 48] wherein it granted the portion of the Lift Stay Motion that requested the stay be lifted to permit the District Court to determine the arbitrability of certain issues. The Memorandum Opinion held in abeyance the remaining briefed matters and found that certain discovery in the Rausch Adversary Proceeding should commence.

.

### 5.   Equipment Liquidation

Following the inability of CBRE to sell the Malvern lease and related equipment, the Debtor determined the best remaining option to monetize the assets at the Malvern location was to run an in-place auction. To that end, on September 16, 2022, the Debtor filed a motion to authorize the retention of Liquidity Services Operations, LLC to sell certain equipment located at the

Malvern facility [D.I. 134]. The Bankruptcy Court entered an order approving such motion on October 12, 2022 [D.I. 160] and Liquidity Services Operations LLC commenced its work and the auction process. On November 4, the Debtor filed a Notice of Conclusion of Auction on November 3, 2022 and a proposed sale order [D.I. 175, 176]. The Court entered the proposed order on November 7, 2022 [D.I. 179] and the sales are in the process of closing. Net proceeds from such sales to the estate are expected to be in the range of $140,000 - $160,000. On November 8, 2022, Rausch and WTE2 moved to set aside the order approving the liquidation sales, which motion was heard on November 21, 2022 and upon which the Court reserved judgment to permit settlement discussions.

6. *Settlement of the Rausch Adversary Proceeding and Extinguishment of the WTE2 Claim*

On or about November 28, 2022, the Debtor reached a settlement, which is reflected in a binding term sheet (the "**Binding Term Sheet**") with Rausch and his affiliated entities, including WTE2 and NWT II, to resolve the Rausch Adversary Proceeding, the Pre-Petition Action and certain others disputes between the parties thereto. The Binding Term Sheet contemplates, among other things, the payment to the Debtor by the Rausch parties of $1,000,000, the assumption and assignment, to Rausch and WTE2, of the Malvern Lease and the free and clear sale of certain fixed equipment located thereon. As part of the proposed settlement, the WTE2 Claim will be withdrawn, as well as any other claims submitted by Rausch and/or NWT II. The Court held a hearing to approve the Binding Term Sheet on December 19, 2022 and indicated it would approve the Binding Term Sheet, other than approving the assumption and assignment of the Malvern Lease, which issue was reserved.

## IV.    SUBCHAPTER V PLAN AND CONFIRMATION REQUIREMENTS

The Debtor submits that this Plan: (a) provides the content required by Bankruptcy Code section 1190; and (b) as set forth more fully below, is confirmable under section 1191 because: (i) pursuant to the terms of this Plan, Holders of Allowed Claims will receive as much or more than they would in a hypothetical chapter 7 liquidation, (ii) this Plan is "fair and equitable" as required by Bankruptcy Code sections 1129 and 1191, and (iii) this Plan is feasible as Debtor will be able to make Distributions to Holders of Allowed Claims as contemplated under this Plan.

### A.    This Plan Meets the "Best Interest of Creditors" Test and Is "Fair and Equitable"

Bankruptcy Code section 1191(c) permits the Debtor to repay Allowed Claims on a *Pro Rata* basis over a period of three (3) to five (5) years. Unfortunately, the Debtor's financial projections show that the Debtor will have no aggregate disposable income over the three (3) year projection period, after paying operating expenses, litigation costs, and post-confirmation taxes. Notwithstanding the lack of disposable income, through the agreement of the Debtor and the DIP Lender, the GUC Pool will be made available on a *Pro Rata* basis for Holders of Allowed General Unsecured Claims. All payments required made in Cash to Holders of Allowed Claims under this Plan will be funded by Cash on Hand and the Plan Note.

Further, the Debtor's Liquidation Analysis, demonstrates that this Plan complies with the "best interest of creditors" test and is "fair and equitable" because it proposes to provide Distributions to Holders of Allowed Claims on the Effective Date or thereafter, as provided in this Plan, and such Holders of Claims will not receive less than they would if the Debtor sought relief under chapter 7 of the Bankruptcy Code.

**B.      This Plan is Feasible as the Debtor Will Be Able to Make All Distributions Contemplated Under this Plan**

As an initial matter the Debtor believes it will have enough Cash on Hand on the Effective Date of the Plan or funds available through the Plan Note or Settlement Payment to pay all the Allowed Administrative Expense Claims and Allowed Professional Fee Claims and to fund the GUC Pool on the Effective Date or as soon as practicable thereafter. Holders of Allowed Class 2 Claims will be paid, *Pro Rata*, from the GUC Pool.

## V.      TREATMENT OF UNCLASSIFIED CLAIMS

**A.      Treatment of Administrative Expense Claims**

All requests for payment of Administrative Expense Claims must be filed and served on the Debtor or Reorganized Debtor, as applicable, pursuant to the procedures specified in the Confirmation Order and notice of entry of the Confirmation Order, if applicable, <u>no later than thirty (30) days after the Effective Date</u> (the "**Administrative Expense Bar Date**"). Holders of Administrative Expense Claims that are required to, but do not, file and serve a request for payment of such Administrative Expense Claims against the Debtor or its property and such Administrative Expense Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the requesting party no later than sixty (60) calendar days after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be filed with respect to a previously allowed Administrative Expense Claim.

Except to the extent that any Entity entitled to payment of an Allowed Administrative Expense Claim agrees to a different treatment, each Holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim upon the later of (x) the Effective Date or (y) fourteen (14) days after the entry of a Final Order Allowing such Administrative Expense Claim, or as soon thereafter as is practicable. Such payments to Holders of Allowed Administrative Expense Claims shall be paid by the Reorganized Debtor from Cash on Hand on the Effective Date of the Plan or the proceeds of the Plan Note. Objections to Administrative Expense Claims must be filed and served on the requesting party no later than sixty (60) days after the Effective Date, unless such objection deadline is extended by order of the Bankruptcy Court upon the motion of the Reorganized Debtor (the "**Administrative Expense Claim Objection Deadline**").

**B.      Treatment of Professional Fee Claims**

*1. Payment of Professional Claims*

All Professionals seeking allowance by the Bankruptcy Court of a Professional Claim shall be paid in full in Cash in such amounts as are approved by the Bankruptcy Court upon (i) the later of (x) the Effective Date and (y) fourteen (14) days after the date upon which the order relating to the allowance of any such Allowed Professional Claim is entered or (ii) such other terms as may be mutually agreed upon between the Holder of such Professional Claim and the Reorganized Debtor.

### 2. Timing for Filing Professional Claims

All requests for compensation or reimbursement of Professionals retained in this Chapter 11 Case for services performed and expenses incurred prior to the Effective Date shall be filed and served on: (i) the Debtor, Medical Technology Associates II, Inc. 1176 Tourmaline Dr., Thousand Oaks, CA 91320 (Attention: Hubert Ho, Ph.D.); (ii) counsel to the Debtor, Gellert Scali Busenkell & Brown, LLC, 1201 N. Orange Street, Suite 300, Wilmington, DE 19801 (Attention: Michael Busenkell, Esq.), E-Mail: mbusenkell@gsbblaw.com; (iii) counsel to the DIP Lender, (a) Hahn & Hahn LLP, 301 E. Colorado Blvd., Ninth Floor, Pasadena, CA 91101 (Attention: Dean G. Rallis Jr., Esq.) E-Mail: drallis@hahnlawyers.com, and (b) Bayard, P.A., 600 North King Street, Suite 400, Wilmington, Delaware 19801 (Attention: Erin R. Fay, Esq. and Daniel N. Brogan, Esq.), E-Mail: efay@bayardlaw.com and dbrogan@bayardlaw.com; (iv) the United States Trustee for Region 3, J. Caleb Boggs Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attention: Linda J. Casey, Esq.), E-Mail: linda.casey@usdoj.gov; and (v) the SubChapter V Trustee, Richard E. Furtek, CPA, Furtek & Associates LLC, Valleybrooke Corporate Center, 101 Lindenwood Drive, Suite 225, Malvern, PA 19355, E-Mail: rfurtek@furtekassociates.com by no later than thirty (30) days after the Effective Date (the "**Professional Claims Deadline**"), unless otherwise agreed by the Reorganized Debtor, or extended by order of the Bankruptcy Court. Objections to any Professionals Claim must be filed and served on the Reorganized Debtor, Gold Blaze, the United States Trustee, the SubChapter V Trustee and the requesting Professional no later than twenty-one (21) days after filing of the applicable Professional's request, unless otherwise ordered by the Bankruptcy Court (the "**Professional Claims Objection Deadline**").

### 3. Post-Effective Date Fees and Expenses

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

## C.    Treatment of Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim, if any,[3] shall receive in full satisfaction of such Allowed Priority Tax Claim (a) payment in Cash equal to the unpaid portion of such Allowed Priority Tax Claim, to be paid in regular installments paid over a period not exceeding 3 years from the order of relief; or (b) Cash in an amount agreed to by the Reorganized Debtor and

---

[3] The Debtor estimates that there are no Priority Tax Claims.

such Holder.  Such payments to Holders of Allowed Priority Tax Claims shall be paid by the Reorganized Debtor from Cash on Hand on the Effective Date of the Plan or the proceeds of the Plan Note.

### D. Subchapter V Trustee Compensation

The Subchapter V Trustee shall be paid for services rendered in this Chapter 11 Case by way of a Professional Fee Claim subject to the deadlines and procedures contained in Article V.B. of this Plan.  All fees and expenses requested by the Subchapter V Trustee are subject to review and approval by the Bankruptcy Court under section 29 and 330 of the Bankruptcy Code.

### E. Treatment of DIP Lender Claims and the Exit Facility

The DIP Lender Claims include all Claims against the Debtor arising under the DIP Financing or the DIP Financing Order, including all Claims for all principal amounts outstanding, interest, expenses, costs, and other charges.

All outstanding DIP Lender Claims shall be deemed to be Allowed Claims. All commitments under the DIP Financing shall terminate on the Effective Date.  The DIP Lender Claims shall be satisfied by the DIP Lender receiving 100% of the New Equity Interests in the Reorganized Debtor.

## VI. TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A. Summary of Treatment of Claims and Equity Interests Under this Plan

The following chart provides a summary of treatment of each Class of Claims and Equity Interests (other than Administrative Expense Claims, Priority Tax Claims, Professional Claims, and the DIP Lender Claims) and an estimate of the recoveries of each Class.  The treatment provided in this chart is for informational purposes only and is qualified in its entirety by Article VI.C. of this Plan.

| Class | Estimated Allowed Claims | Treatment and Voting Status | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Class 1—<br>General Unsecured Claims | $11,727,522[4] | Impaired<br>Entitled to Vote | UNKNOWN |
| Class 2—<br>Equity Interests | n/a | Impaired<br>Deemed to Reject | Cancelled. |

### B. Classification of Claims and Equity Interests

[4] The amount of estimated Allowed General Unsecured Claims reflected here does not include additional General Unsecured Claims of $192,758 which are expected to be successfully disputed.

The below categories of Claims and Equity Interests classify such Claims and Equity Interests for all purposes, including voting, Confirmation, and Distribution pursuant hereto and pursuant to Bankruptcy Code sections 1122 and 1123.

**C.    Treatment of Claims and Equity Interests**

**1.    Class 1— General Unsecured Claims**

a.    *Classification*

Class 1 consists of General Unsecured Claims.

b.    *Impairment and Voting*

Class 1 is impaired by this Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject this Plan.

c.    *Treatment*

Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable or different treatment, each Holder of an Allowed General Unsecured Claim shall receive: (i) their *Pro Rata* distribution of GUC Pool, or (ii) such other treatment to the Holder of an Allowed General Unsecured Claim as to which the Debtor or Reorganized Debtor, as applicable, and the Holder of such Allowed General Unsecured Claim shall have agreed upon in writing.

**2.    Class 2—Equity Interests**

a.    *Classification*

Class 2 consists of the Equity Interests in the Debtor.

b.    *Impairment and Voting*

Class 2 is impaired by and conclusively deemed to reject the Plan and, therefore, Holders of the Debtor's Equity Interests are not entitled to vote to accept or reject this Plan.

c.    *Treatment*

On the Effective Date, the Equity Interests in the Debtor shall be discharged, cancelled, released, and extinguished and Holders of Equity Interests shall neither receive any Distributions nor retain any property under this Plan for or on account of such Equity Interests.

**D.    Cramdown and No Unfair Discrimination**

The Debtor reserves the right seek Confirmation pursuant to Bankruptcy Code section 1191(b), which allows the Bankruptcy Court to confirm this Plan even if no Impaired Class votes

in favor of this Plan so long as this Plan does not unfairly discriminate and is fair and equitable. Colloquially, this mechanism is known as a "cramdown."

As set forth above, under Article VI.C. of this Plan, the treatment of Claims and Equity Interests described in this Plan is "fair and equitable," within the meaning of Bankruptcy Code section 1191(c). Additionally, this Plan does not discriminate unfairly. The proposed treatment of Claims and Equity Interests provides that each Holder of such Allowed Claim or Interest will be treated identically within its respective Class and that, except when agreed to by such Holder, no Holder of any junior Claim or Equity Interest will receive or retain any property on account of such junior Claim or Interest. Thus, this Plan satisfies the standard for cramdown confirmation under Bankruptcy Code section 1191(b).

## VII.    IMPLEMENTATION AND EXECUTION OF THIS PLAN

### A.    Plan Funding

The Plan will be funded by Cash on Hand and the proceeds of the Plan Note. Additionally, as set forth in Article VII.F. of this Plan, upon the Effective Date, all property of the Debtor, tangible and intangible, including, without limitation, claims, causes of action, licenses, furniture, fixtures and equipment, will revert, free and clear of all Claims and Interests except as provided in this Plan to the Reorganized Debtor. Thereafter, the Newco Assets will be Transferred to Newco.

### B.    The Plan Note

The terms of the Plan Note Documents shall be agreed to between the Reorganized Debtor and the Plan Note Funder. On the Effective Date, the Plan Note Documents shall be executed and delivered by the Reorganized Debtor and Plan Note Lender.  Confirmation of this Plan shall be deemed to constitute approval of the Plan Note Documents, and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtor to enter into and perform its obligations in connection with the Plan Note Documents without the need for any further action.

On the Effective Date, the Plan Note Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtor and the non-Debtor parties to the Plan Note Documents, enforceable in accordance with their terms.  Pursuant to this Plan, the financial accommodations to be extended pursuant to the Plan Note Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

The Reorganized Debtor's obligations under the Plan Note Documents shall be secured pursuant to the Plan Note Liens, which shall constitute first priority perfected liens and security interests on all assets of the Reorganized Debtor to the extent provided in the Plan Note Documents.  On the Effective Date, all of the Plan Note Liens (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Plan Note Documents, (2) shall be deemed automatically perfected on the Effective

Date, and (3) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

The Reorganized Debtor and the Entity(ies) granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### C.    New Equity Interests in the Reorganized Debtor

On the Effective Date, all Equity Interests in the Debtor shall be discharged, cancelled, released, and extinguished and 100% of the New Equity Interests in the Reorganized Debtor shall be issued to the DIP Lender.  Such issuance of the New Equity Interests (i) shall be free and clear of all liens, claims, encumbrances and interests, and (ii) is authorized without the need for any further corporate action or without any further action by a Holder of Claims or Interests. The New Equity Interests issued pursuant to this Plan shall be deemed duly authorized and validly issued.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance and distribution of the New Equity Interests as contemplated by this Plan and all agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration before the offering, issuance, distribution or sale of securities

### D.    Continued Corporate Operations

The Reorganized Debtor will continue to operate with the primary purpose of resolving its litigation issues with WTE2 and Rasuch and administering the Plan and its remaining assets. Following the Effective Date, the Newco Assets will be transferred to Newco which will then operate such assets.

### E.    Exemption from Certain Taxes and Fees

Pursuant to Bankruptcy Code section 1146(a), the issuance, transfer or exchange of notes or equity securities under or in connection with this Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated herein, or other transactions, contemplated under this Plan shall not be subject to any stamp, real estate transfer, mortgage or other similar tax.

### F.        Vesting of Assets

Except as otherwise expressly provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated in this Plan or the Plan Supplement, pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), 1141(b) and (c), and any other applicable provisions of the Bankruptcy Code, on the Effective Date, all property and Assets of Debtor's Estate, including all claims, rights, and Causes of Action of the Debtor, and any other assets or property acquired by the Debtor during the Chapter 11 Case or under or in connection with this Plan, shall automatically, without the notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, rule or any requirement of further action, vote or other approval or authorization of the security holders, Holders of Equity Interests, members, managers, officers or directors of the Debtor, or the other applicable Entity or by any other person (except for those expressly required pursuant hereto or by the Plan Documents), vest in the Reorganized Debtor free and clear of all Claims, Liens, charges, and other encumbrances, subject to any Liens, if any, which survive the occurrence of the Effective Date as described in this Plan. On and after the Effective Date, the Reorganized Debtor may operate its businesses and use, acquire, and dispose of its property, without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Confirmation Order.

### G.        Section 1145 Exemption

To the maximum extent permitted by Bankruptcy Code section 1145 and applicable nonbankruptcy law, the offer or sale of Equity Interests under this Plan is exempt from all federal, state, or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker dealer in such securities and is not deemed to be a public offer of such securities.

### H.        Post-Confirmation Management

Effective upon the Effective Date, the Debtor's certificate or articles of incorporation and bylaws shall be amended so that the Reorganized Debtor's Board of Directors will consist of one (1) member, Cheng, or as otherwise disclosed in the Plan Supplement.

### VIII.        EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.        Assumed Executory Contracts

On the Effective Date, certain Executory Contracts and Unexpired Leases to be identified shall be deemed assumed by the Reorganized Debtor.  Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any.  A forthcoming exhibit will also list how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.  If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of future performance, you must file and serve your objection to the assumption within the deadline for objecting to the confirmation of the Plan, unless the Bankruptcy Court has set an earlier time.

**B.      Rejection Claims and the Rejection Claims Bar Date**

Upon the Effective Date, any Executory Contract and Unexpired Lease other than the Malvern Lease that is not expressly assumed shall be deemed to have been rejected by the Debtor. As to the Malvern Lease, the Debtor shall have until January 31, 2023 to determine whether to assume or reject, subject to further extension as agreed between the Debtor or Reorganized Debtor and the landlord for the Malvern Lease.

Any and all Claims for damages arising from the rejection of an Executory Contract or Unexpired Lease other than the Malvern Lease must be filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date (the "**Rejection Claims Bar Date**"); provided, however that the Rejection Claims Bar Date for the Malvern Lease shall be no later than thirty (30) days after the Debtor provides the landlord for the Malvern lease with written notice of its intent to reject the Malvern Lease.  Any Claims for damages arising from the rejection of an Executory Contract that is not filed within such time period will be forever barred from assertion against the Debtor, its Estate and the Reorganized Debtor.  Unless otherwise Ordered by the Bankruptcy Court, all Claims arising from the rejection of Executory Contracts shall be treated as General Unsecured Claims under this Plan.

**C.      Insurance Policies**

Notwithstanding anything to the contrary herein or in the Plan Documents and/or the Confirmation Order: (i) nothing in this Plan, the Plan Documents, or the Confirmation Order shall terminate or otherwise reduce coverage under any of the Debtor's insurance policies; (ii) on and after the Effective Date, all of the Debtor's insurance policies, shall be deemed to be, and shall be treated as, executory contracts under this Plan and shall be assumed pursuant to Bankruptcy Code sections 105 and 365 by the Debtor and such policies shall vest in the Reorganized Debtor.

**D.      Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or that the Reorganized Debtor has any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

## IX.      DISTRIBUTIONS

**A.    Reorganized Debtor to Make Distributions**

Unless ordered otherwise in the Confirmation Order, the Reorganized Debtor shall make all Distributions.

**B.    Method of Payment; Payments, Filings, and Notices Only on Business Days**

Unless otherwise expressly agreed in writing, payments of Cash under this Plan shall be made by a check drawn on a domestic bank or an electronic wire. Whenever any payment, Distribution, Filing, delivery, or notice to be made under this Plan is due on a day other than a Business Day, such payment, Distribution, Filing, delivery, or notice may instead be made, without interest or penalty, on the immediately following Business Day.

**C.    Projections in Support of Debtor's Ability to Make Payments Under the Proposed Plan**

The Debtor intends to provide projected financial information in the near term.

**D.    Delivery of Distributions**

Except as provided herein, any Distributions to Holders of Allowed Claims shall be made by written check mailed to the addresses: (a) set forth on the respective Proofs of Claim filed by such Holders; (b) set forth in any written notices of address changes delivered to the Debtor or Reorganized Debtor, as applicable, after the filed date of any related Proof of Claim; or (c) reflected in the Schedules if no Proof of Claim is filed and the Debtor or Reorganized Debtor has not received a written notice of a change of address.

**E.    Disputed Claims**

Notwithstanding any other provision of this Plan, no payment or Distribution shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order or as otherwise permitted by this Plan. Unless another time and date are set by order of the Bankruptcy Court, the Reorganized Debtor shall have until the Claims Objection Deadline to object to Disputed Claims, and such deadline is subject to extension pursuant to an order of the Bankruptcy Court and/or agreement of the parties. For the avoidance of doubt, the Reorganized Debtor shall have exclusive authority to settle and resolve Disputed Claims on such terms as it deems appropriate without the need for Bankruptcy Court approval.

Except as otherwise provided herein, within the later of (i) seven (7) Business Days after a Disputed Claim becomes an Allowed Claim and (ii) thirty (30) Business Days after the expiration of the Claims Objection Deadline, the Reorganized Debtor shall distribute all available Cash or other property, including any interest, dividends, or proceeds thereof, to which a Holder of an Allowed Claim is then entitled.

**F.    Compliance With Tax Requirements**

In connection with this Plan and all Distributions thereunder, to the extent applicable, the Reorganized Debtor is authorized to take any and all actions that may be necessary or appropriate to comply with all Tax withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding and reporting requirements.  The Reorganized Debtor may require, as a condition to receipt of Distributions, that the Holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such Holder.  If the Reorganized Debtor makes such a request and the

Holder fails to comply before the date that is ninety (90) days after the request is made, unless such date is extended in the sole discretion of the Reorganized Debtor, the amount of such Distribution shall irrevocably revert to the Reorganized Debtor and the right to a distribution on account of such Claim shall be forfeited.

### G.    Undeliverable or Unclaimed Distributions

If any Distribution to a Holder of any Allowed Claim is returned to the Reorganized Debtor as undeliverable, no further distribution shall be made to such Holder unless and until the Reorganized Debtor is notified in writing of such Holder's then current address, at which time such undelivered distribution shall be made to such Holder within ninety (90) days of receipt of such Holder's then current address or other necessary information; provided that any such undelivered distribution shall be deemed unclaimed property under Bankruptcy Code section 347(b) and revert to the Reorganized Debtor at the expiration of six (6) months from the later of (a) the Effective Date and (b) the date of the initial attempted Distribution. Notwithstanding anything to the contrary contained in this Plan, nothing in this provision shall act as a bar to entry of a Final Decree Closing the Chapter 11 Case.

### H.    Setoff and Recoupment

From and after the Effective Date, the Reorganized Debtor may, to the extent permitted by Bankruptcy Code section 558 or applicable non-bankruptcy law, set off against or recoup from any Claim on which distributions are to be made, any Causes of Action of any nature whatsoever that the Reorganized Debtor may have against the Holder of such Claim; *provided, however*, that neither the failure to effect such setoff or recoupment nor the Allowance of any Claim shall constitute a waiver or release of any right of setoff or recoupment, nor any other Cause of Action.

### I.    No Interest

Unless otherwise explicitly provided for in this Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

## X.    ALLOWANCE OF AND OBJECTIONS TO CLAIMS

### A.    Late Claims

Upon entry of an order of a Bankruptcy Court disallowing such a Claim, a Person or Entity that filed a Claim or Proof of Claim after the applicable Bar Date will not be treated as a Holder of an Allowed Claim for purposes of voting or Distributions with respect to this Plan.

### B.    Estimation of Claims

The Debtor or Reorganized Debtor, as applicable, may, at any time, request that the Bankruptcy Court estimate any Contingent, unliquidated, or Disputed Claim(s), pursuant to Bankruptcy Code section 502(c) irrespective of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. For the avoidance of

doubt, the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Subject to the provisions of section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any Contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute the maximum allowable amount of such Claim for purposes of voting on this Plan and Distributions. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or Reorganized Debtor, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.

### C.    Objections to and Resolution of the Claims

The Reorganized Debtor shall have the right to file objections to Claims before the Claims Objection Deadline. All objections shall be litigated to entry of a Final Order; *provided, however*, that only the Reorganized Debtor has the authority to compromise, settle, otherwise resolve, or withdraw any objections without approval of the Bankruptcy Court.

### D.    Claims Objection Deadline

Except as otherwise set forth in Article V above, with respect to Professionals Claims and Administrative Claims, the Reorganized Debtor shall file and serve any objection to any Claims no later than the Claims Objection Deadline; *provided*, *however*, the Claims Objection Deadline may be extended by the Bankruptcy Court from time to time upon motion and notice by the Reorganized Debtor.

### E.    Cumulative

All of the procedures set forth under this Article are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved as provided herein or by a mechanism approved by the Bankruptcy Court.

## XI.    EFFECT OF PLAN CONFIRMATION

### A.    Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062, upon the occurrence of the Effective Date, the terms of this Plan shall inure for the benefit of the Debtor, Reorganized Debtor, and their respective successors and assigns and be immediately effective and enforceable and deemed binding upon the Debtor, Reorganized Debtor, and any and all Holders of Claims, including unknown Claims, and Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts with the Debtor.

**B.      Discharge**

As soon as practicable after completion by the Debtor of all payments due under the Plan, unless the Bankruptcy Court approves a written waiver of discharge executed by the Debtor after the order for relief under this chapter, the Bankruptcy Court shall grant the Debtor a discharge of all debts provided in sections 1141(d)(1)(A) and 1192 of the Bankruptcy Code, and all other debts allowed under section 503 of this title and provided for in this Plan.

**C.      Retention, Reservation, and Prosecution of Causes of Action**

In accordance with Bankruptcy Code section 1123(b) or any corresponding provision of federal or state laws, and except as otherwise provided in this Plan or the Confirmation Order, on and after the Effective Date, all Causes of Action shall be retained by the Reorganized Debtor, and the Reorganized Debtor may, in accordance with this Plan, enforce, sue on, settle, or compromise (or decline to do any of the foregoing) any or all of such Causes of Action.

Except as otherwise explicitly provided in this Plan, nothing in this Plan shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, account receivable, right of setoff, or other legal or equitable right or defense that the Estate may have or choose to assert on behalf of the Debtor or its Estate under any provision of the Bankruptcy Code or any applicable non-bankruptcy law. No entity may rely on the absence of a specific reference in this Plan to any Cause of Action or account receivable against it as an indication that the Debtor will not pursue any and all available Causes of Action or accounts receivable against it, and all such rights to prosecute or pursue any and all Causes of Action or accounts receivable against any entity are expressly reserved for later adjudication and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action or accounts receivable upon or after the Confirmation or Consummation of this Plan.

Prior to, on, or after the Effective Date, as applicable, all matters expressly provided for under this Plan that would otherwise require approval of the stockholders, equity security holders, officers, directors, partners, managers, members, or other owners of the Debtor shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date, as applicable, pursuant to applicable laws, without any requirement of further vote, consent, approval, authorization, or other action by such stockholders, equity security holders, officers, directors, partners, managers, members, or other owners of the Debtor or notice to, order of, or hearing before the Bankruptcy Court.

**XII.     CONDITIONS TO CONFIRMATION AND THE EFFECTIVE DATE**

**A.      Conditions Precedent to Confirmation**

Unless duly waived as provided for by this Plan, confirmation shall not occur until the Confirmation Order is entered by the Bankruptcy Court and is in form and substance reasonably satisfactory to the Debtor and the DIP Lender.

**B.**      **Conditions Precedent to the Effective Date**

The Effective Date shall not occur and the Plan shall not be consummated unless and until each of the following conditions has been satisfied or duly waived as provided by this Plan: (i) the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the Debtor and the DIP Lender; (ii) the Confirmation Order shall have become a Final Order; and (iii) the Plan Note Documents have been executed by the Debtor and the DIP Lender.

**C.**      **Establishing the Effective Date**

The calendar date to serve as the Effective Date shall be a Business Day of, on or promptly following the satisfaction or waiver of all conditions to the Effective Date, which date will be selected by the Debtor and DIP Lender.  On or within one (1) Business Days of the Effective Date, the Debtor shall file and serve a notice of occurrence of the Effective Date. Such notice shall contain, among other things, (i) the Administrative Expense Bar Date, (ii) the Professional Claims Deadline, and (iii) the deadline to file a proof of claim relating to damages from the rejection of any Executory Contract or Unexpired Lease by the terms of this Plan.

**D.**      **Waiver of Conditions**

The conditions to the Effective Date set forth herein may be waived only by consent of the Debtor and the DIP Lender without any notice to other parties in interest or the Bankruptcy Court and without any formal action other than proceeding to confirm or consummate this Plan. The failure to satisfy any condition before the Confirmation Date or the Effective Date may be asserted by the Debtor or the DIP Lender as a reason not to seek Confirmation or declare an Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtor, in its sole discretion). The failure of the Debtor or the DIP Lender, each in its sole discretion, to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each such right shall be deemed an ongoing right, which may be asserted at any time.

**E.**      **Effect of Nonoccurrence of Conditions**

If the Effective Date does not occur: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (c) nothing contained in this Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtor or any other Person or Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Person or Entity.

### XIII.    EXCULPATION, RELEASES, AND INJUNCTIONS

**A.    Exculpation**

**The Exculpated Parties shall not have or incur, and are hereby released from, any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability to one another or to any Holder of any Claim or Equity Interest, or any other party-in-interest, or any of their respective Related Parties, for any act or omission originating or occurring on or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of (i) the Chapter 11 Case, (ii) the negotiation and Filing of this Plan, (iii) the Filing of the Chapter 11 Case, (iv) the prosecution or settlement of Claims and Causes of Action, (v) the performance, assumption, assignment, termination, or rejection of Executory Contracts, (vi) the pursuit of confirmation of this Plan, (vii) the consummation of this Plan, (viii) the administration of this Plan or (ix) the distribution of property to be Distributed under this Plan, except for (a) any Claims and Causes of Action for actual fraud, willful misconduct or gross negligence as determined by Final Order of a court of competent jurisdiction and (b) any obligations that they have under or in connection with this Plan or the transactions contemplated in this Plan.  Nothing herein shall prevent any Exculpated Party from asserting as a defense to any claim of actual fraud, willful misconduct or gross negligence that they reasonably relied upon the advice of counsel with respect to their duties and responsibilities under this Plan.**

**B.    Releases by the Debtor**

**Except for any Claims and Causes of Action for actual fraud, willful misconduct or gross negligence as determined by Final Order of a court of competent jurisdiction, effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, its Estate and any Person or Entity seeking to exercise the rights of the Debtor's Estate, including, without limitation, each of the Debtor's successors and assigns, shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably and forever release, waive, void and extinguish the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability, whether known or unknown, foreseen or unforeseen, existing or hereinafter existing, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, direct or derivative, based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the capital structure, management, ownership or operation thereof), the DIP Lender, the business operation of the Debtor, actions taken by the Debtor's board as comprised during the Chapter 11 Case, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among the Debtor and any Released Party, the Debtor's restructuring efforts, the incurrence of the Gold Blaze Loan Payable or Gold Blaze Prepetition Claim, the ownership or operation of the Debtor by any Released Party, any Avoidance Actions, in connection with, relating to, or arising out of (i) the Chapter 11 Case, (ii) the negotiation, formulation, and Filing of this Plan, (iii) the Filing of the Chapter 11 Case, (iv) the prosecution or settlement of Claims and Causes of Action, (v) the performance, assumption, assignment, termination, or rejection of Executory Contracts or Unexpired Leases, (vi) the pursuit of confirmation of this Plan, (vii) the consummation of this Plan, (viii)**

the administration of this Plan or (ix) the distribution of property to be Distributed under this Plan.

Notwithstanding anything to the contrary in the foregoing paragraph, the releases and set forth in this Article XIII: (i) do not release any post-Effective Date obligations of the Debtor or the Reorganized Debtor under this Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan; and (ii) do not affect the rights of Holders of Allowed Claims to receive Distributions under this Plan.

## C.    Injunctions Relating to Releases

Except as expressly otherwise provided in this Plan or in an Order of the Bankruptcy Court, effective as of the Effective Date, all Persons that hold, have held or may hold a claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability of any nature whatsoever, that is released pursuant to this Plan, shall be permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such released claims, Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum, (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order, (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien, and (iv) setting off (except to the extent such setoff was exercised prior to the Effective Date and, if asserted or exercised after the Petition Date, Allowed or permitted by the Bankruptcy Court), seeking reimbursement or contributions from, or subrogation against, directly or indirectly, any amount against any liability or obligation owed to any Person released under this Plan.

## D.    Injunctions to Protect Estate Assets

Except as expressly otherwise provided in this Plan, or to the extent necessary to enforce the terms and conditions of this Plan, the Confirmation Order or a separate Order of the Bankruptcy Court, all Entities who have held, hold or may hold Claims against or Equity Interests in the Debtor shall be permanently enjoined from taking any of the following actions against the Debtor, the Debtor's Estate, the Reorganized Debtor or any of their property on account of any such Claims or Equity Interests:  (i) commencing or continuing, in any manner or in any place, any action, Cause of Action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or Order; (iii) creating, perfecting, or enforcing any Lien; and (iv)  asserting a setoff (except to the extent such setoff was exercised prior to the Effective Date and, if asserted or exercised after the Petition Date, Allowed or permitted by the Bankruptcy Court),  or right of subrogation, against any debt, liability, or obligation due to the Debtor.

# XIV.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, to the fullest extent permissible under law, over all matters arising out of and related to the Chapter 11 Case for, among other things, the following purposes:

1.    To hear and resolve the Rausch Adversary Proceeding;

2.    To hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

3.    To hear and determine pending applications for the assumption or rejection of Executory Contracts, if any are pending, and the allowance of any Claims resulting therefrom;

4.    To enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

5.    To issue such Orders in aid of execution and consummation of this Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

6.    To consider any amendments to or modifications of this Plan, to cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

7.    To hear and determine all requests for compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code;

8.    To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Plan;

9.    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtor or the Reorganized Debtor for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

10.    To hear any other matter not inconsistent with the Bankruptcy Code;

11.    To enter a final decree closing the Chapter 11 Case;

12.    To ensure that Distributions to Holders of Allowed Claims are accomplished as provided by the provisions of this Plan;

13.    To decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

14. To issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of this Plan, except as otherwise provided herein;

15. To determine any other matters that may arise in connection with or related to this Plan, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with this Plan;

16. To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

17. To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

18. To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the Rejection Bar Date, the Administrative Expense Bar Date, the Professional Claims Deadline, or the final hearing on the confirmation of this Plan for the purpose of determining whether a Claim, or Equity Interest is released, satisfied and/or enjoined hereunder or for any other purpose; and

19. To resolve any other matter or for any purpose specified in this Plan, the Confirmation Order, or any other document entered into in connection with any of the foregoing.

## XV.    MISCELLANEOUS PROVISIONS

### A.    Amendment or Modification of this Plan

Alterations, amendments, or modifications of this Plan may be proposed in writing by the Debtor at any time before the Confirmation Date; provided that this Plan, as altered, amended, or modified, satisfies the conditions of Bankruptcy Code sections 1122, 1123, and 1190 and the Debtor shall have complied with Bankruptcy Code section 1125. The Debtor may modify this Plan at any time after Confirmation and before substantial consummation, provided that this Plan, as modified, meets the requirements of Bankruptcy Code sections 1122, 1123, and 1190 and the circumstances warrant such modifications. A Holder of a Claim that has accepted this Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

### B.    Exhibits/Schedules

All exhibits and schedules to the forthcoming Plan Supplement are incorporated into and part of this Plan as if set forth in full herein.

### C.     Plan Supplement

Draft forms of certain documents, agreements, instruments, schedules, and exhibits specified in this Plan shall, where expressly so provided for in this Plan, be contained in the Plan Supplement filed from time to time. Unless otherwise expressly provided in this Plan, the Debtor may file any Plan Supplement until fourteen days prior to this Plan objection deadline and may alter, modify, or amend any Plan Supplement in accordance with this Plan.

### D.     Additional Documents

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The Debtor or Reorganized Debtor, as applicable, and all Holders of Claims or Interests receiving Distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

### E.     Discharge of Subchapter V Trustee

Upon the Effective Date of the Plan, the Subchapter V Trustee is discharged from and relieved of his trust and his duties and responsibilities are terminated

### F.     Final Decree

Once the estate has been fully administered, as provided in Bankruptcy Rule 3022, the Debtor, or such other party as the Bankruptcy Court shall designate in the Plan Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

### G.     Governing Law

Except as required by the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the rights and obligations arising under this Plan shall be governed by, construed and enforced in accordance with the laws of the State of Delaware.

### F.     Time

To the extent that any time for the occurrence or happening of an event as set forth in this Plan falls on a day that is not a Business Day, the time for the next occurrence or happening of said event shall be extended to the next Business Day.

### G.     Severability

Should any provision of this Plan be deemed unenforceable after the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Plan.

## H.    Revocation

The Debtor reserves the right to revoke and withdraw this Plan prior to the entry of the Confirmation Order. If the Debtor revokes or withdraws this Plan, this Plan shall be deemed null and void, and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor, any other Person, or to prejudice in any manner the rights of such parties in any further proceedings involving the Debtor.

## I.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## J.    Inconsistency

To the extent that this Plan conflicts with or is inconsistent with any agreement related to this Plan, the provisions of this Plan shall control.

## K.    Entire Agreement

Except as otherwise indicated, on the Effective Date, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of this Plan, all of which will have become merged and integrated into this Plan on the Effective Date.

## M.    No Admissions

Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed an admission by any Entity with respect to any matter set forth herein.

## N.    Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. The filing of this Plan, any statement or provision contained herein, or the taking of any action by the Debtor with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtor, Holders of Claims, or Holders of Equity Interests before the Effective Date.

## O.    2002 Service List

After the Effective Date, any Entities or Persons that want to continue to receive notice in these Chapter 11 Case must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002 no later than fourteen (14) days after the Effective Date of this Plan; *provided*, *however*; that the United States Trustee shall be excused from this requirement and shall remain on the Bankruptcy Rule 2002 service list. To the extent a renewed request is not timely filed with the

Bankruptcy Court, the Reorganized Debtor is authorized to limit notice and not include such Entities or Persons on any post-Effective Date Bankruptcy Rule 2002 service list.

**P.    Notices**

Any pleading, notice, or other document shall be in writing and, unless otherwise provided herein, shall be served on:

| | |
|---|---|
| Debtor/Reorganized Debtor: | Medical Technology Associates II, Inc.<br>1176 Tourmaline Dr.<br>Thousand Oaks, CA 91320<br>Attn: Hubert Ho, Ph.D. |
| Counsel for Debtor: | Gellert Scali Busenkell & Brown, LLC<br>1201 N. Orange St., 3rd Floor<br>Wilmington, Delaware 19801<br>Attn: Michael Busenkell and Ronald S. Gellert |
| Counsel for the DIP Lender: | Bayard, P.A.<br>600 North King Street, Suite 400<br>Wilmington, Delaware 19801<br>Attn: Erin R. Fay and Daniel N. Brogan |
| Subchapter V Trustee: | Richard E. Furtek, CPA<br>Furtek & Associates LLC<br>Valleybrooke Corporate Center<br>101 Lindenwood Drive, Suite 225<br>Malvern, PA 19355 |
| United States Trustee: | Office of the United States Trustee for the District of Delaware<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, Delaware 19801<br>Attn: Linda Casey |

Dated: December 22, 2022          Respectfully submitted,
Wilmington, DE

                                      GELLERT SCALI BUSENKELL & BROWN, LLC

                                      */s/ Michael Busenkell*
                                      Michael Busenkell (DE 3933)
                                      Ronald S. Gellert (DE 4259)
                                      Bradley P. Lehman (DE 5921)
                                      1201 N. Orange St., Ste. 300
                                      Wilmington, Delaware 19801
                                      Telephone: (302) 425-5800
                                      Facsimile:  (302) 425-5814
                                      mbusenkell@gsbblaw.com
                                      rgellert@gsbblaw.com
                                      blehman@gsbblaw.com

                                      *Attorneys for Debtor and Debtor in Possession*